Demetrius **HERNDON**, Appellant,

v.

Bill **ARMONTROUT**, Donald Cline, McArthur Woodruff, Richard Childs, Lt. Malone, Lt. Spencer, Lt. McDaniels, Sgt. Salts, COI Shebert, John Does, Appellees.

Samuel D. **SMITH**, Appellant,

v.

Donald **CLINE**, Richard Childs, Lt. Spencer, Billy Hinch, Michael Malone, Kenneth McDaniel, Lt. Lonnie Salts, David Schubert, James Welch, Rickie Stapp, John Doe I, John Doe II, John Doe III, Appellees.

Nos. 91–2848, 92–1534.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1992.

Decided March 2, 1993.

James W. Riner, Jefferson City, MO, argued, for appellant.

Mark M. Tungesvik, Jefferson City, MO, argued (Bruce Farmer, on the brief), for appellees.

Before WOLLMAN, Circuit Judge, BRIGHT and HENLEY, Senior Circuit Judges.

WOLLMAN, Circuit Judge.

Demetrius Herndon and Samuel Smith appeal from the district court's [1] judgment entered upon jury verdicts against them in their actions brought under 42 U.S.C. § 1983. For reversal, they argue that the district court erred in instructing the jury and in entering judgment upon jury verdicts not supported by sufficient evidence. We affirm.

---

**1.** The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

## I.

On August 28, 1986, Herndon and Smith were inmates in the Special Management Facility of the Missouri State Penitentiary in Jefferson City, Missouri. While in the prisoner dining hall for their noon meal, they were involved in a fight with prisoners Keith Brown and Robert Hill, who were armed with homemade knives. Sergeant Lonnie Salts was the first corrections officer to see the fight. He reported the fight on his two-way radio and then intervened. Lieutenant Dennis Spencer and Corrections Officer Russell Bellamy arrived at the fight in response to Salts's radio transmission. They removed Herndon and Smith from the dining hall and took them out through a doorway, referred to as the T–5 door, and up a flight of stairs to a landing, referred to as the T–3 landing. A short time later, Lieutenant Robert Malone and Captain Richard Childs also took Brown and Hill to the T–3 landing, where a second fight broke out. During these altercations, both Smith and Herndon were stabbed.

Herndon and Smith brought actions under section 1983 against several Missouri prison officials and corrections officers. They alleged that their injuries were the result of the defendants' failure to adequately protect them from attacks by other inmates, in violation of their constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments. The only issue submitted to the jury was whether Sergeant Salts, Lieutenant Spencer, Lieutenant Malone, Lieutenant Kenneth McDaniel, and Captain Childs adequately protected Herndon and Smith from the second altercation on the T–3 landing. The jury returned verdicts in favor of all five defendants.

## II.

Herndon and Smith raise two arguments on appeal. First, they contend that the court misstated the law in the verdict-directing jury instruction. Second, they argue that insufficient evidence exists to support the verdicts.

Herndon and Smith argue that the verdict-directing instruction misstated the law concerning the degree of protection prison officials must provide inmates. More specifically, citing *Vosburg v. Solem*, 845 F.2d 763, 765 (8th Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988), they argue the verdict director failed to inform the jury that prisoners have a right to "reasonable protection" from attacks by other prisoners. The challenged instruction reads as follows:

On [plaintiff's name] claim for damages against defendant [name], your verdict must be for plaintiff [name] and against defendant [name] if you believe:

FIRST, that on or about August 28, 1986, in the vicinity of the T–3 landing, [plaintiff's name] was stabbed by inmates Hill or Brown or both of them; and

SECOND, that when inmates Hill and Brown were allowed to leave the dining room with knives defendant [name] should have known that Hill or Brown posed a threat of physical harm to [plaintiff's name]; and

THIRD, that as a result defendant [name] was deliberately indifferent to [plaintiff's name] constitutional right to receive protection from violent attacks by fellow inmates because either:

defendant intended to deprive plaintiff of protection from violent attacks by fellow inmates

or

defendant acted with reckless disregard of *plaintiff's right to protection from violent attacks by fellow inmates;* . and

FOURTH, plaintiff was thereby damaged.

"Reckless disregard of plaintiff's *right to reasonable protection* from violent attacks by fellow inmates" means that defendant knew of the danger to plaintiff and failed to *respond reasonably* to that danger.

Your verdict must be for defendant [name] if you do not believe each and every one of the above propositions.

Instruction No. 11 (emphasis added). Focusing on the language, "plaintiff's right to protection from violent attacks by fellow inmates," in the third element, Herndon and Smith argue that the instruction, as given, improperly allowed the jury to find for the defendants if they provided any degree of protection, without regard to whether the protection was reasonable.

■ When reviewing a challenge to a particular jury instruction, we determine whether the instructions, taken as a whole and viewed in light of the evidence and the applicable law, fairly and adequately submitted the issues in the case to the jury. *See, e.g., Jones v. Bd. of Police Comm'rs,* 844 F.2d 500, 504 (8th Cir.1988), *cert. denied,* 490 U.S. 1092, 109 S.Ct. 2434, 104 L.Ed.2d 990 (1989). Because Herndon and Smith failed to object to the instruction at trial, we review the alleged deficiency in the instruction for plain error. *Id.* Plain error has occurred when the error so seriously affected the fairness or integrity of the trial that it produced a miscarriage of justice. *Id.*

■ It is true that the third element of the instruction refers only to Herndon and Smith's right to protection and by itself does not specify that the protection must be reasonable. The definitional section of the instruction, however, does refer to the plaintiffs' right to reasonable protection. It states that " '[r]eckless disregard of *plaintiff's right to reasonable protection* from violent attacks by fellow inmates' means that [the] defendant knew of the danger to plaintiff and failed to *respond reasonably* to that danger." In the light of these references to the "plaintiffs right to reasonable protection" from attacks and to the defendant's obligation to "respond reasonably" to the danger of attacks, we hold that the instruction, taken as a whole, did not result in a miscarriage of justice.

■ Herndon and Smith next argue that the verdicts were not supported by sufficient evidence. In determining whether substantial evidence exists to support a verdict, we examine the evidence in the light most favorable to sustaining the verdict and give the prevailing party the benefit of all reasonable inferences that may be drawn from the evidence. *Sanders v. St. Louis County,* 724 F.2d 665, 667 (8th Cir. 1983) (per curiam). It is the jury's province and duty to resolve conflicts in testimony. *See, e.g., Carter v. Jacobsen,* 748 F.2d 487, 488 (8th Cir.1984). Again, because Herndon and Smith did not move for a directed verdict,[2] a judgment notwithstanding the verdict, or a new trial, we review the claim of insufficient evidence for plain error. *Id.* (citing *Shell v. Missouri Pacific R.R.,* 684 F.2d 537, 540 (8th Cir.1982)); *Hollins v. Powell,* 773 F.2d 191, 194 (8th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). Examining the evidence through this lens, we find sufficient evidence to support the jury's verdicts in favor of all five defendants.

■ Sergeant Salts was the first corrections officer to observe the fight. He immediately reported the fight to the corrections staff via his radio and then intervened. When he did so, he was confronted by inmate Brown. Brown swung his knife at Salts and told him that he was dead if he moved another step. Closely surrounded by inmates at this point, Salts radioed for immediate assistance.

Lieutenant Spencer and Corrections Officer Bellamy ran to the dining hall in response to Sergeant Salt's initial radio transmission. When they arrived, they observed Salts between Brown, who was brandishing his knife at Salts, and Smith, who was swinging a metal silverware holder at Brown. Lieutenant Spencer grabbed Smith, pulled him back from the melee, and escorted him across the dining hall toward the T–5 door. As Officer Bellamy was helping Lieutenant Spencer remove Smith, Herndon approached Bellamy and told him that he had been stabbed. Seeing that Herndon's stomach area was covered with blood, Bellamy decided that Herndon should also be removed from the dining

---

**2.** Now entitled a motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50(a) (as amended effective December 1, 1991).

hall. The two officers took Smith and Herndon out the T–5 door to the T–3 landing. Once they reached the landing, Herndon sat down because he was unable to continue due to his wound. Lieutenant Spencer then called for a stretcher for Herndon. If Herndon had not had to stop, Lieutenant Spencer would have taken Smith to a holding cell and Officer Bellamy would have taken Herndon to the prison hospital.

Lieutenant Malone was on the T–3 landing when he heard Sergeant Salts's initial radio transmission. When he arrived in the dining hall, he did not see Lieutenant Spencer and Officer Bellamy removing Herndon and Smith. His attention was focused on Brown and Hill, who were still armed with knives. Initially, Lieutenant Malone attempted to take Brown's knife away, but Brown resisted by swinging the knife at him. Malone then attempted to talk Brown and Hill into surrendering their weapons. They responded that they would not relinquish their weapons until they were someplace safe. At this point, the inmates in the dining room were throwing things and screaming comments such as "kill them, let's get them." Fearing that the eighty to one hundred inmates in the dining hall would riot, Lieutenant Malone decided to immediately remove Brown and Hill from the dining hall. He had a path cleared and then followed the two inmates out the T–5 door and up the stairs to the T–3 landing. Lieutenant Malone took the armed prisoners out the T–5 exit to the T–3 landing because he thought that it was the only available exit unoccupied by inmates. Malone believed that the landing was unoccupied because he had instructed an officer to secure the landing before he had left it. Malone did not know that Herndon and Smith had been taken there after he had left.

Captain Childs and Lieutenant McDaniel arrived at the fight together. As they arrived, Captain Childs saw Brown brandishing his knife and threatening everyone. He joined Lieutenant Malone in trying to talk Brown and Hill into surrendering their weapons. After Brown and Hill indicated that they would relinquish their weapons if

the officers would remove them from the dining hall, Captain Childs assisted Lieutenant Malone in escorting them to the landing. Like Lieutenant Malone, Childs had no idea that Smith and Herndon had already been removed and were on the landing. Lieutenant McDaniel, on the other hand, had seen Officer Bellamy and Herndon leaving the dining hall, but he did not know they were going to the T–3 landing. After Brown and Hill were removed, Lieutenant McDaniel stayed in the dining area for a short time to help Sergeant Salts regain control. He then proceeded to the T–3 landing, where he helped break up the second fight.

Lieutenant Malone and Captain Childs first became aware that Smith and Herndon were on the landing when Smith attacked Brown and Hill as they approached the top of the stairs. As Brown and Smith started fighting on the landing, Lieutenant Malone attempted to control Brown. Still wielding his knife, Brown slashed at Malone and got away from him. Brown then stabbed Smith. Lieutenant Malone finally controlled Brown and held him until another officer disarmed him. During this second altercation, Officer Bellamy took Herndon safely out an exit at the other end of the T–3 landing.

In short, the defendant corrections officers were faced with a volatile situation that had the potential to escalate into a riot. They had to make quick decisions based on limited information. When Lieutenant Malone and Captain Childs decided to allow Brown and Hill to exit the dining hall while still armed, they were unaware that Brown and Hill had previously been in a fight with Smith and Herndon and that Herndon and Smith were on the landing. Knowing what they did, the officers' decision was reasonable. They had been trained to separate inmates with weapons from other inmates, remove them to a secure area, and then disarm them. The officers knew that an attempt to physically disarm a prisoner in front of a large number of excited, dangerous prisoners can potentially lead to a riot. They also knew that prisoners often will refuse to surren-

der their weapons in front of other inmates, but will voluntarily do so when isolated in a safe place.

In the light of the situation confronting the officers and the information available to them at the time, there is no merit in the contention that the jury's findings are unsupported by the evidence.

The judgment is affirmed.